## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| WATER JUSTICE FOR PUERTO RICO B.V., | )<br>)<br>) |
| Plaintiff, | ) |
| v. | )<br>) |
| MOONSHOT MISSIONS, INC., *et al*., | ) |
| Defendants. | ) |

Civil Action No. 8:24-cv-03446-LKG

Dated:  January 22, 2026

## **MEMORANDUM OPINION**

### I.    INTRODUCTION

In this civil action, the Plaintiff, Water Justice for Puerto Rico B.V., formerly known as Miya Water Projects Netherlands B.V., brings claims for tortious interference with a business relationship, aiding and abetting to interfere with a business relationship and conspiracy to interfere with a business relationship, against the Defendants, Moonshot Missions Inc. ("Moonshot"), George Hawkins ("Hawkins"), Xylem Inc. ("Xylem"), and Sensus USA Inc. ("Sensus"), arising from the cancellation of a public-private partnership project to provide upgrades to the water infrastructure in Puerto Rico.  ECF No. 1.  Defendants Sensus and Xylem (the "Xylem Defendants") have filed a motion to dismiss the claims brought against them pursuant to Fed. R. Civ. P. 12(b)(2) and (b)(6).  ECF Nos. 30 and 30-1.  Defendants Moonshot and George Hawkins (the "Moonshot Defendants") have also filed a motion to dismiss the claims brought against them, pursuant to Fed. R. Civ. P. 12(b)(6).  ECF Nos. 31 and 31-1.  In addition, Defendant Moonshot filed a motion seal Exhibits 1,4 and 7 of the Joint Record relating to Defendants' Motion to Dismiss, pursuant to Fed. R. Civ. P. 5.2 and L.R. 105.11.  ECF No. 43. These motions are fully briefed.  ECF Nos. 30, 30-1, 31, 31-1, 34, 37, 38 and 43.  No hearing is necessary to resolve the motions.  L.R. 105.6 (D. Md. 2025).  For the reasons that follow, the Court: (1) **GRANTS-in-PART** the Moonshot Defendants' motion to dismiss (ECF No. 30); (2)

**GRANTS-in-PART** the Xylem Defendants' motion to dismiss (ECF No. 31); (3) **GRANTS** Defendant Moonshots' motion to seal (ECF No. 43); and (4) **DISMISSES** the complaint.

## II.    FACTS AND PROCEDURAL BACKGROUND[1]

### A. Factual Background

The Plaintiff brings claims for tortious interference with a business relationship, aiding and abetting to interfere with a business relationship and conspiracy to interfere with a business relationship, against the Moonshot Defendants and the Xylem Defendants, arising from the cancellation of a Request for Production (the "RFP") for a project to provide upgrades to the water infrastructure in Puerto Rico. ECF No. 1. Specifically, the Plaintiff asserts the following claims in the complaint: (1) tortious interference with business relationship against the Moonshot Defendants (Count I); (2) tortious interference with business relationship against the Xylem Defendants (Count II); (3) aiding and abetting tortious interference with business relationship against the Xylem Defendants (Count III); (4) aiding and abetting tortious interference with business relationship against the Moonshot Defendants (Count IV); and (5) conspiracy to interfere with business relationship against all Defendants (Count V). *Id*. at ¶¶ 82-109. As relief, the Plaintiff seeks, among other things, to recover compensatory and punitive damages from the Defendants. *Id*. at Prayer for Relief.

<u>The Parties</u>

The Plaintiff is a Besloten Vennootschap formed under the laws of the Netherlands, with its principal place of business located in the Netherlands. *Id*. at ¶ 12. In November 2024, the Plaintiff changed its name from Miya Water Projects Netherlands B.V. to Water Justice for Puerto Rico B.V. *Id*.

Defendant Moonshot is a nonprofit formed under the laws of Maryland, with its principal office located in Bethesda, Maryland. *Id*. at ¶ 14.

Defendant George Hawkins is the President and CEO of Moonshot is domiciled in Bethesda, Maryland. *Id*. at ¶ 15.

---

[1] The facts recited in this memorandum opinion are taken from the complaint; the Xylem Defendants' motion to dismiss, and the memorandum in support thereof; the Moonshot Defendants' motion to dismiss, and the memorandum in support thereof; and the Plaintiff's response in opposition thereto. ECF Nos. 1, 30, 30-1, 31, 31-1 and 34. Unless otherwise stated, the facts recited herein are undisputed.

Defendant Xylem is a water technology corporation organized under the laws of Indiana, with its principal office located in Washington, DC. *Id*. at ¶ 16.

Defendant Sensus is a corporation organized under the laws of Delaware, with its principal office located in Morrisville, North Carolina, and it is a subsidiary of Xylem. *Id.* at ¶¶ 6 and 17.

<u>The RFQ</u>

As background, in 2018 the Puerto Rico Public-Private Partnership Authority (the "P3 Authority") and the Puerto Rico Aqueduct and Sewer Authority ("PRASA") announced a new public-private partnership project to upgrade the water infrastructure in Puerto Rico (the "Project"), to address Puerto Rico's long-standing problems with its water system. *Id*. at ¶ 31. The Project required final approval from the Financial Oversight and Management Board for Puerto Rico (the "FOMB"), which oversees Puerto Rico's budget. *Id*. at ¶ 7; *see also* 48 U.S.C. § 2121 (establishing the FOMB).

In March 2018, PRASA and the P3 Authority published a desirability and convenience study for the Project, which provides the rationale for the Project and the desired component of the Project as follows:

a.  First, the project would replace the island's aging water metering system with new, wireless, smart meters that would accurately measure water usage. This would allow for remote meter readings at the district and household level, as well as for the elimination of reading estimations.

b.  Second, the project would involve advanced analytics that would aggregate and analyze the information taken from the smart meters, enabling more efficient and reliable revenue collection. The new technology would pinpoint water leaks and provide critical analytics about infrastructure usage, allowing PRASA to make more informed investment decisions and reduce its levels of nonrevenue water.

c.  Third, the project would integrate the new metering systems with billing, collections, and the infrastructure for managing customer relationships. Using the metering data, the contractor would, for example, modify billing schedules, manage and execute new collection protocols, and develop new customer service procedures. The Desirability and Convenience Study forecasted that the project would allow it to increase the rate of collection, reduce the average time for resolution of customers' claims, and lead to an overall improvement in customer satisfaction.

3

d.  Fourth, the increased revenues generated by the project would allow PRASA to make capital improvements in its water infrastructure, reducing physical water losses through leaks and other infrastructure failures. In turns, these improvements would not only improve customer satisfaction, they would further reduce the proportion of nonrevenue water, increasing PRASA's net revenues and creating the possibility of a virtuous cycle of reinvestment into Puerto Rico's water infrastructure.

*Id*. at ¶ 33 (emphasis removed).  The desirability and convenience study also estimates the Project's net profits between $560 and $650 million over a fifteen-year term.  *Id*. at ¶ 34.

In June 2018, PRASA and the P3 Authority issued a Request for Qualifications ("RFQ") for the Project, entitled "Optimizing PRASA's Metering Infrastructure and Customer Service Experience."  *Id*. at ¶ 36; *see also* ECF No. 39-2 (RFQ).  Section 1.9.2 of the RFQ provides that PRASA and the P3 Authority "reserve the right to modify or terminate this procurement process at any stage if [they] determine such action to be in their best interests."  ECF No. 39-2 at J.R. 23; *see also* ECF No. 39-3 at J.R. 71 ("[T]he Request for Proposals for the Project provided for the Authority's power to terminate the procurement process, at any time . . . .").  The RFQ also provides that:

Neither the [P3] Authority, the [P3] Committee (as defined herein), nor PRASA accept liability for the costs and expenses incurred by any Proponent or Contractor in responding to this RFQ and subsequent RFP, responses to clarification requests and re-submittals, interviews (if applicable), and subsequent negotiations. Each Proponent that participates in the procurement process outlined in this document shall prepare the required materials and submittals at its own expense and with the express understanding that no claim whatsoever for reimbursement from the PPP Committee, the PPP Authority or PRASA for the costs and expenses associated with the process can be made.

ECF No. 39-2 at J.R. 23.  Five bidders responded to the RFQ, including the Plaintiff, which was then known as Miya, and the IBT (the "IBT Team") and the BLU WATER Consortium.  ECF No. 1 at ¶ 37.  In September 2018, the P3 Authority notified four bidders, including the IBT Team and the BLU WATER Consortium, that they had been selected to proceed to the RFP stage.  *Id*. at ¶ 38.

<u>The RFP</u>

On September 26, 2018, the P3 Authority and PRASA issued a Request for Proposals (the "Original RFP") for the Project.  *Id*. at ¶¶ 2, 31 and 39.  "[T]he Original RFP called for the

installation of state-of-the-art 'smart' water meters, along with the implementation of advanced analytics to take full advantage of the new meters and integrate them into PRASA's billing, collections, and customer relationship processes." *Id*. at ¶ 2. In January 2019, the IBT Team submitted its indicative response to the Original RFP. *Id*. at ¶ 40.

On February 15, 2019, PRASA and the P3 Authority notified the IBT Team that it had been selected as one of the two finalists for the Original RFP, along with the BLU WATER Consortium. *Id*. at ¶ 41. PRASA and the P3 Authority then gave the IBT Team and the BLU WATER Consortium several months to develop a final RFP Response. *Id*. at ¶ 42.

Shortly thereafter, the IBT Team was able to secure $275 million in financing from JP Morgan Chase. *Id*. at ¶ 43. And so, the IBT Team submitted its final response to the Original RFP on July 17, 2019. *Id*. at ¶ 44.

On August 12, 2019, the P3 Authority notified the IBT Team that it had been selected as the "Preferred Proponent" for the metering project. *Id*. at ¶ 45. And so, the IBT Team continued to work toward advancing the metering project from August 12, 2019, until December 2021. *Id*. at ¶ 46.

But, on October 15, 2020, the FOMB informed the IBT Team that it had concerns regarding the Project and, shortly thereafter, the FOMB communicated to the P3 Authority that it would not recommend the approval of the Project as structured. *Id*. at ¶¶ 63 and 73. And so, on February 18, 2021, the P3 Authority notified the IBT Team that the scope of work for the Project would need to be adjusted and that the IBT Team would need to submit a revised fee structure and project scope. *Id*. at ¶ 74.

The IBT Team submitted a revised pricing proposal on July 21, 2021, and a final revised proposal on September 8, 2021. *Id*. at ¶ 75. Nonetheless, on December 2, 2021, the P3 Authority notified the IBT Team *via* letter that it was cancelling the Original RFP. *Id*. at ¶ 76. And so, PRASA issued the Revised RFP for a project for the replacement of Puerto Rico's water meters, on January 4, 2022. *Id*. at ¶ 77.

The Plaintiff's Allegations

The Plaintiff alleges in Count I of the complaint that the Moonshot Defendants tortiously interfered with its business contract, because the Moonshot Defendants were aware of its business relationship with the P3 Authority with regards to the RFP, and the Moonshot Defendants "intentionally, unjustifiably, and improperly interfered with [that] business

relationship. *Id*. at ¶ 85.  Specifically, the Plaintiff allege that the Moonshot Defendants interfered with its business relationship with the P3 Authority by:

    a.  conceal[ing] their connections to [the Xylem Defendants] in certifying to the FOMB that they had no conflicts of interest to allow them to obtain the position of "independent" contractor to the FOMB; and

    b.  deliberately [giving] information to the FOMB that was false, misleading, and/or intended to disparage the IBT Team's bid and achieve the cancellation of the project, under the false guise of a supposedly "independent" evaluation of the IBT Team's proposal.

*Id*. at ¶¶ 83-86.  Given this, the Plaintiff contends that the IBT Team would have concluded a binding, enforceable P3 Agreement with the P3 Authority to carry out the metering project as envisioned in the Original RFP, had the Moonshot Defendants not interfered with the IBT Team's business relationship with the P3 Authority. *Id*. at ¶ 87.

In Count II of the complaint, Plaintiff alleges a claim of tortious interference with a business contract against the Xylem Defendants. *Id*. at ¶¶ 89-94.  Specifically, the Plaintiff alleges that the Xylem Defendants "obtained advanced warning about the Revised RFP from [the Moonshot Defendants and], immediately swung into action with a bid for the Revised RFP." *Id*. at ¶ 79.  The Plaintiff also alleges that the Xylem Defendants "gave false or misleading information about [the IBT Team] to individuals at the P3 Authority, PRASA, and/or Arcadis" and that "[t]hey did so with the specific intent of inducing the P3 Authority to cancel the Original RFP and end its business relationship with the IBT Team and steering the project back to [the Xylem Defendants]." *Id*. at ¶ 92.  And so, the Plaintiff alleges that it would have concluded a binding, enforceable P3 Agreement, but for the Xylem Defendants' interference. *Id*. at ¶ 93.  The Plaintiff also alleges that the Xylem Defendants "rendered substantial assistance to [the Moonshot Defendants] in committing tortious interference with business relationship" in Count III of the complaint. *Id*. at ¶ 98.

In addition, in Count IV of the complaint, Plaintiff alleges that the Moonshot Defendants aided and abetted the Xylem Defendants tortious interference of a business relationship by "[feeding] information learned through their contracting with the FOMB to [the Xylem Defendants] in order to allow those entities to more effectively lobby for the cancellation of the Original IBT." *Id*. at ¶ 103.

6

Lastly, in Count V of the complaint, Plaintiff alleges that the Moonshot Defendants conspired with the Xylem Defendants "by reaching an agreement with each other to wrongfully induce the cancellation of the Original RFP by feeding false or misleading information to the FOMB, the P3 Authority, PRASA, and/or Arcadis." *Id.* at ¶ 107. In this regard, the Plaintiff alleges that the Defendants "committed numerous overt acts in furtherance of the conspiracy" including, among other things:

- The Moonshot Defendants concealed their connections to the Xylem Defendants in certifying to the FOMB that they had no conflicts of interest to allow them to obtain the position of "independent" contractor to the FOMB and recommend against the approval of the water metering project.

- The Xylem Defendants fed false and misleading information about Miya and IBT to the authorities through other channels to achieve the cancellation of the Original RFP and the issuance of the Revised RFP.

*Id.* at ¶ 108. And so, the Plaintiff seeks, among other things, to recover compensatory and punitive damages from the Defendants. *Id.* at Prayer for Relief.

### B. Procedural History

On November 27, 2024, Plaintiff filed the complaint. ECF No. 1. On March 21, 2025, the Xylem Defendants filed a motion to dismiss the complaint, pursuant to Fed. R. Civ. P. 12(b)(2) and (b)(6), and a memorandum in support thereof. ECF Nos. 30 and 30-1. On March 21, 2025, the Moonshot Defendants filed a motion to dismiss the complaint, pursuant to Fed. R. Civ. P. 12(b)(6), and a memorandum in support thereof. ECF Nos. 31 and 31-1.

On April 21, 2025, Plaintiff filed a response in opposition to the Defendants' motions to dismiss. ECF No. 34. On May 5, 2025, the Moonshot Defendants filed their reply brief. ECF No. 37.

On May 12, 2025, the Xylem Defendants filed their reply brief. ECF No. 38. On May 19, 2025, the Moonshot Defendants filed a motion to seal Exhibits 1,4 and 7 of the Joint Record of Exhibits relating to the Moonshot Defendants motion to dismiss. ECF No. 43.

The Defendants' respective motions to dismiss having been fully briefed, the Court resolves the pending motions.

### III.  LEGAL STANDARDS

#### A. Fed. R. Civ. P. 12(b)(2)

A motion to dismiss for lack of personal jurisdiction, brought pursuant to Fed. R. Civ. P. 12(b)(2), "raises an issue for the [C]ourt to resolve, generally as a preliminary matter." *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016). The burden is "on the plaintiff ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). To do so, "a plaintiff need only make a *prima facie* showing of personal jurisdiction to survive the jurisdictional challenge." *Grayson*, 816 F.3d at 268. When deciding a motion brought pursuant to Fed. R. Civ. P. 12(b)(2), the Court may "rule solely on the basis of motion papers, supporting legal memoranda, affidavits, and the allegations in the complaint." *State v. Exxon Mobil Corp.*, 406 F. Supp. 3d 420, 437 (D. Md. 2019) (citation omitted). And so, the Court must consider all disputed facts and make reasonable inferences in favor of the plaintiff in determining whether the plaintiff has made the requisite showing that the Court possesses personal jurisdiction over a defendant. *See id.* "Under such circumstances, courts must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005) (citation modified).

To assert personal jurisdiction over a non-Maryland resident defendant, two conditions must be satisfied: (1) the exercise of jurisdiction must be authorized under the State's long-arm statute and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment. *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003) (citation omitted). Relevant here, Section 6-103(b) of the Maryland long-arm statute confers jurisdiction over an out-of-state defendant when his agent "[c]auses tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any persistent course of conduct in the State or derives substantial revenue from . . . services . . . in the state." Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(4). Maryland courts have "long-established that personal jurisdiction may be exercised over a nonresident defendant on the basis of the actions of the nonresident defendant's agent." *Mackey v. Compass Mktg. Inc.*, 892 A.2d 479, 484 (Md. 2006). In this regard, courts have applied the conspiracy theory of personal jurisdiction to the application of the Maryland long-arm statute, permitting the Court "to exercise personal jurisdiction over a nonresident defendant without sufficient contacts with the forum if the nonresident defendant was part of a

8

conspiracy that committed jurisdictionally sufficient acts within the forum." *Ohio Learning Ctrs., LLC v. Sylvan Learning, Inc.*, No. CIV.A. RDB-10-1932, 2012 WL 1416905, at *5 (D. Md. Apr. 24, 2012) (citing *Mackey*, 892 A.2d at 484).

To establish specific personal jurisdiction on under the conspiracy theory of personal jurisdiction, the complaint must allege facts that show that:

(1)  two or more individuals conspire to do something

(2)  that they could reasonably expect to lead to consequences in a particular forum, if

(3)  one co-conspirator commits overt acts in furtherance of the conspiracy, and

(4)  those acts are of a type which, if committed by a non-resident, would subject the non-resident to personal jurisdiction under the long-arm statute of the forum state, then those overt acts are attributable to the other co-conspirators, who thus become subject to personal jurisdiction in the forum, even if they have no direct contacts with the forum.

*Mackey*, 892 A.2d at 486 (citation omitted).  Given this, "it is an inescapable constitutional requirement that a plaintiff must first make a *prima facie* claim that a conspiracy existed before a defendant is hailed into a foreign court based on the conspiracy theory of personal jurisdiction." *Ohio Learning Ctrs.*, 2012 WL 1416905, at *5.[2]  Once the Court has established that the Maryland long-arm statute confers personal jurisdiction, the Court must also consider whether the exercise of jurisdiction over the Defendants would violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.  *Carefirst of Md.*, 334 F.2d at 396.  In this regard, Maryland courts "have consistently held that the State's long-arm statute is

---

[2] Courts that have approved the exercise of long-arm jurisdiction pursuant to the "conspiracy theory of personal jurisdiction consistently require a threshold showing that a conspiracy existed and that the defendants participated therein. *McLaughlin v. McPhail*, 707 F.2d 800, 807 (4th Cir. 1983) (citation omitted).  "[T]o properly assert a civil conspiracy claim, it is necessary for a plaintiff to first plead the existence of a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or means employed must result in damages to the plaintiff.  *Ohio Learning Ctrs., LLC v. Sylvan Learning, Inc.*, No. CIV.A. RDB-10-1932, 2012 WL 1416905, at *5 (D. Md. Apr. 24, 2012) (citation modified).  And so, conclusory allegations without supporting facts demonstrating an agreement or understanding between the two persons is insufficient to support the Court's exercise of personal jurisdiction under a conspiracy theory of personal jurisdiction. *See id*. at *6.

coextensive with the limits of personal jurisdiction set by the due process clause of the Constitution." *Id.* And so, the Court's jurisdiction over a non-Maryland resident comports with due process if the defendant has "minimum contacts" with the forum, such that exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation modified).

In addition, the "minimum contacts" analysis can be established either through general jurisdiction—arising from a defendant's contacts with a forum state which are so systematic and continuous as to essentially place the defendant "at home"—or specific jurisdiction—arising from an "affiliation between the forum and the underlying controversy." *Ark. Nursing Home Acquisition, LLC v. CFG Cmty. Bank*, 460 F. Supp. 3d 621, 639 (D. Md. 2020) (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 262-63 (2017)). Relevant here, specific jurisdiction requires consideration of: "(1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiffs' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *Carefirst of Md.*, 334 F.2d at 397 (citation omitted). And so, the Fourth Circuit has recognized that one factor indicating "purposeful availment" is whether the defendant "reached into the forum state to solicit or initiate business." *Ark. Nursing Home Acquisition*, 460 F. Supp. 3d at 639-40 (quoting *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009)).

## B. Fed. R. Civ. P. 12(b)(6)

To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible when "the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). When evaluating the sufficiency of a plaintiff's claims under Fed. R. Civ. P. 12(b)(6), the Court accepts the factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005) (citation omitted). But, the complaint must contain more than "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." *Nemet Chevrolet*,

591 F.3d at 255.  And so, the Court should grant a motion to dismiss for failure to state a claim if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *GE Inv. Private Placement Partners II, L.P. v. Parker*, 247 F.3d 543, 548 (4th Cir. 2001) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 249-50 (1989)).[3]

### C.  Tortious Interference With Business Relationship

To state a claim for tortious interference with a business relationship under Puerto Rico law, the complaint must allege facts that show: (1) the existence of a contract with which a third party interferes; (2) that there is fault; (3) that the third party caused damage to the plaintiff; and (4) that the damage is a consequence of the third party's culpable conduct, that is, that the causal link must be between the act of the third party and its effect on the injured party. *Gen. Off. Prods. v. A.M. Capen's Sons*, 115 D.P.R. 553, 558 (1984); *Dolphin Int'l of P.R. v. Ryder Truck Lines*, 127 D.P.R. 869 (1991).  In this regard, Puerto Rican courts have held that, "[r]egarding the first element, we have stated that if what is affected is an expectation or a beneficial economic relationship, without a contract, an action for damages due to culpable interference is not admissible." *Batista Valentin v. Batista Valentin*, 2025 TSPR 93 (P.R. Oct. 1, 2025) (citing *Gen. Office Prods.*, 115 D.P.R. at 559).

To state a claim for tortious interference with a business relationship under Florida law, the complaint must allege facts that show: "(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the interference." *Treco Int'l S.A. v. Kromka*, 706 F. Supp. 2d 1283, 1289 (S.D. Fla. 2010) (citation omitted).  In this regard, Florida courts have held that while "[a] protected business relationship need not be evidenced by an enforceable contract [,]. . . the alleged business relationship must afford the plaintiff existing or prospective legal or contractual rights." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994) (citation modified) (denying a claim for tortious interference with business relationship where party "had no identifiable agreement with its past

---

[3] The United States Court of Appeals for the Fourth Circuit has held that the Court may consider documents beyond the complaint when considering a motion to dismiss under Rule 12(b)(6), if the documents are "explicitly incorporated into the complaint by reference," or are "integral to the complaint and there is no dispute about the document's authenticity."  *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

customers that they would return" for future business); *see also St. Johns River Water Mgmt. Dist. v. Fernberg Geological Servs., Inc.*, 784 So. 2d 500, 505 (Fla. Dist. Ct. App. 2001) (holding that even where the plaintiff had completed first phase of a multi-phase contract, the plaintiff failed to establish a protected business relationship when later phases required funding that remained undecided and uncertain).  This Court has also held that the statute of limitations for a tortious interference with contractual relations claim accrues upon the date the contract is breached or terminated.  *See J.E. Dunn Const. Co. v. S.R.P. Dev. Ltd. P'ship*, 115 F. Supp. 3d 593, 615 (D. Md. 2015) (citing cases).

### D.  Choice Of Law

Lastly, this Court has held that "[f]ederal courts sitting in diversity must apply the substantive law of the forum state, including the forum state's choice of law rules."  *Smith v. MTD Prod., Inc.*, No. CV CCB-19-1592, 2019 WL 5538273, at *2 (D. Md. Oct. 24, 2019) (quoting *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941)).  Given this, "[f]or claims in tort, Maryland follows the *lex loci delicti rule*."  *Id.* (citation omitted); *see Philip Morris, Inc. v. Angeletti*, 752 A.2d 200, 230 (Md. 2000).

The Court has also held that "[w]here the events giving rise to a tort action occur in more than one State," the Court must "apply the law of the State where the injury—the last event required to constitute the tort—occurred."  *Smith v. MTD Prod., Inc.*, No. CV CCB-19-1592, 2019 WL 5538273, at *2 (D. Md. Oct. 24, 2019) (citation omitted).  In addition, the United States Court of Appeals for the Fourth Circuit has explained that the doctrine of "*lex loci delicti* recognizes the legitimate interests which the [state where the harm occurred] has in the incidents of the act giving rise to the injury."  *Id.* (citation omitted).  And so, "[t]he place of injury is the place where the injury was suffered, not where the wrongful act took place."  *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 511 (4th Cir. 1986) (citation omitted); *see M-Edge Accessories LLC v. Amazon.com Inc.*, Case No. MJG-11-3332, 2013 WL 50251, at *3 (D. Md. Jan. 2, 2013) ("[T]he place of injury is considered to be the place where the actual damage occurs, even if the conduct resulting in the injury occurred in another state.").

Where the alleged injuries are economic, rather than personal, Maryland courts traditionally consider injuries to occur where the injured party resides.  *Gorby v. Weiner*, No. CIV.A. TDC-13-3276, 2014 WL 4825962, at *4 (D. Md. Sept. 23, 2014); *Starr v. VSL Pharms., Inc.*, 509 F. Supp. 3d 417, 458 (D. Md. 2020); 21 M.L.E. Torts § 2 ("The place of injury means

the place where the injury was suffered rather than the place where the wrongful act took place[.]"); *Terry v. Corp. Am. Fam. Credit Union*, No. JKB-19-1065, 2019 WL 5065183, at *7 (D. Md. Oct. 9, 2019) ("The Court concludes that Maryland should be regarded as the place of any injury to the [plaintiffs] because this is the state in which they reside, and it is logical that they have suffered economic injury where they live, where they can be sued for debt collection, and where they might claim injury to their credit ratings.").  But, Maryland courts have not explicitly addressed "the proper application of *lex loci delicti* in cases where the wrongful conduct in one jurisdiction causes pecuniary loss or injury to the plaintiff in another jurisdiction."  *Menk v. MITRE Corp.*, 713 F. Supp. 3d 113, 183 (D. Md. 2024) (citation omitted).  And so, in such cases, this Court has applied the law of the jurisdiction where the alleged wrongful act occurred, rather than where the alleged loss was felt.  *Cremi v. Brown*, 955 F. Supp. 499, 522 (D. Md. 1997) (applying Texas law to the plaintiffs' claims common law claims of breach of fiduciary duty, negligence, negligent misrepresentation, and fraud, because Texas was where the alleged misrepresentations and omission by the defendants occurred, rather than applying the law where the plaintiff's resided—Mexico); *Menk*, 713 F. Supp. 3d at 183 ("Guided by *Cremi*, the court finds that the place of wrong is where the alleged wrongful discharge took place, which is Virginia" rather than in Maryland, the plaintiffs' home states where the alleged injuries/harms occurred.); *Carroll v. Walden Univ., LLC*, 650 F. Supp. 3d 342, 368 (D. Md. 2022) ("Based on guidance from *Cremi*, and the allegations in the [c]omplaint, the court finds that in this case where the alleged wrongful conduct occurred in a different jurisdiction than where the loss was felt, the place of the injury is where the wrong occurred (Minnesota) not where the loss was felt (North Carolina, Louisiana, and Virginia).").

## IV.    ANALYSIS

The Xylem Defendants have moved to dismiss the claims brought against them in this case, pursuant to Fed. R. Civ. P. 12(b)(2) and (b)(6), upon the following five grounds: (1) the Court lacks personal jurisdiction over them; (2) the Plaintiff fails to state a plausible tort of tortious interference with a business relationship claim against them, because Puerto Rico law applies to the Plaintiff's claims and that law does not recognize the tort of tortious interference with a business relationship absent a contractual agreement; (3) even if Florida law or Maryland law apply to the Plaintiff's tortious interference with a business relationship claim, the claim still fails, because the Plaintiff fails to plead a business relationship and malicious or unjustified

interference, or defamatory or injurious falsehoods; (4) the Plaintiff fails to state a claim for aiding and abetting tortious interference with a business relationship, because the Plaintiff fails to state a claim for tortious interference with a business relationship and the Plaintiff has not pled specific facts that give rise to a reasonable inference of actual knowledge of the alleged wrongdoing to adequately plead aiding and abetting; and (5) the Plaintiff fails to state a claim for conspiracy to interfere with a business relationship, because it fails to state a claim for tortious interference with a business relationship and the Plaintiff's conspiracy claim is based upon speculation. ECF No. 30-1 at 15-37. And so, the Xylem Defendants request that the Court grant their motion to dismiss and dismiss the claims brought against them in Counts II, III and V of the complaint. *Id*. at 37.

The Moonshot Defendants have also moved to dismiss the claims brought against them in this case, pursuant to Fed. R. Civ. P. 12(b)(6), upon the following grounds: (1) the Plaintiff fails to state a claim for tortious interference with a business relationship, because Puerto Rico law applies to this case and that law does not recognize the tort of tortious interference with a business relationship absent the existence of a contract; (2) even if Florida law applies, the Plaintiff fails to state a claim for tortious interference with business relationship, because the complaint does not adequately alleged facts that show a business relationship, or to show malicious or unjustified interference, and the alleged harm is not attributable to the Moonshot Defendants; (3) the Plaintiff fails to state a claim for aiding and abetting tortious interference with a business relationship and conspiracy to interfere with a business relationship, because the Plaintiff fails to state a claim for tortious interference with business relationship; (4) the Plaintiff fails to state a claim for aiding and abetting tortious interference, because the complaint lacks facts to show that the Moonshot Defendants acted knowingly and substantially assist in the underlying alleged tort; (5) the complaint lacks facts to show an agreement between co-conspirators, which is required to state a claim for civil conspiracy; and (6) the Plaintiff's claim is time-barred, because the complaint was filed more than three years after the P3 Authority informed the IBT Team of the need to adjust the project's scope and to submit a new fee structure on February 18, 2021. ECF No. 31-1 at 4-24. And so, the Moonshot Defendants request that the Court grant its motion to dismiss and dismiss the claims against them in Count I, IV and V. *Id*. at 27.

In its response in opposition to the Defendants' respective motions, the Plaintiff counters that the Court should not dismiss this matter, because: (1) the complaint alleges sufficient facts to establish specific personal jurisdiction over the Xylem Defendants; (2) the Plaintiff's claims are timely, because the complaint was filed  within three years of the date that the Plaintiff was notified of the decision to rescind the RFP–December 2, 2021; (3) Florida law applies to the Plaintiff's tortious interference with a business relationship claims, because IBT resides in Florida and the economic injury of losing the RFP was felt in Florida; (4) the complaint also states a claim for tortious interference with a business relationship, because the complaint adequately pleads facts that show a business relationship between the Plaintiffs and the P3 Authority, and intentional and unjustified interference with that business relationship by the Defendants; (5) the complaint states a claim for aiding and abetting tortious interference with a business relationship, because the complaint sufficiently alleges the Defendants' knowledge of the tortious interference and that each of the Defendants "substantially assisted" each other in the interference; and (6) the complaint states a claim for conspiracy to interfere with a business relationship, because the complaint shows an agreement between the Defendants to interfere with the Plaintiff's contract for the Project and alleges overt acts in furtherance of that interference.  ECF No. 34 at 5-39.  And so, the Plaintiff requests that the Court deny the Defendants' respective motions to dismiss.[4]  *Id*. at 40.

For the reasons set forth below, the Plaintiff has not met its burden to establish a *prima facie* case to show that the Court may exercise personal jurisdiction over the Xylem Defendants. But the Plaintiff has shown that its claims against the Moonshot Defendants are timely.

In addition, a careful reading of the complaint shows that Puerto Rico law applies to the Plaintiff's tort claims against the Moonshot Defendants.  The factual allegations in the complaint also make clear that the Plaintiff fails to state plausible claims for tortious interference with a business relationship, aiding and abetting tortious interference with a business relationship and conspiracy to interfere with a business, under Puerto Rican law, because it is undisputed that the Plaintiff did not enter into a contract with the P3 Authority in connection with the Project.  And so, the Court: (1) **GRANTS-in-PART** the Moonshot Defendants' motion to dismiss (ECF No. 30); (2) **GRANTS-in-PART** the Xylem Defendants' motion to dismiss (ECF No. 31); (3)

---

[4] In the alternative, the Plaintiff requests leave to amend the complaint.  ECF No. 34 at 38-39.

**GRANTS** Defendant Moonshot's motion to seal (ECF No. 43); and (4) **DISMISSES** the complaint.

### A. The Court Lacks Personal Jurisdiction Over The Xylem Defendants

As an initial matter, the Xylem Defendants argue with persuasion that the Court lacks personal jurisdiction over them in this case. To exercise personal jurisdiction over a non-Maryland resident defendant, two conditions must be satisfied: (1) the exercise of jurisdiction must be authorized under the State's long-arm statute and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment. *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc*., 334 F.3d 390, 396 (4th Cir. 2003) (citation omitted). Relevant here, Section 6-103(b) of the Maryland long-arm statute confers jurisdiction over an out-of-state defendant when his agent "[c]auses tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any persistent course of conduct in the State or derives substantial revenue from . . . services . . . in the state." Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(4). Maryland courts have also "long-established that personal jurisdiction may be exercised over a nonresident defendant on the basis of the actions of the nonresident defendant's agent." *Mackey v. Compass Mktg*., 892 A.2d 479, 484 (Md. 2006). In this regard, courts have applied the conspiracy theory of personal jurisdiction to the application of the Maryland long-arm statute, permitting the Court "to exercise personal jurisdiction over a nonresident defendant without sufficient contacts with the forum if the nonresident defendant was part of a conspiracy that committed jurisdictionally sufficient acts within the forum." *Ohio Learning Ctrs., LLC v. Sylvan Learning, Inc.*, No. CIV.A. RDB-10-1932, 2012 WL 1416905, at *5 (D. Md. Apr. 24, 2012) (citing *Mackey*, 892 A.2d at 484).

In this case, it is undisputed that the Xylem Defendants are not domiciled in, nor have a principal places of business in, Maryland. ECF No. 1 at ¶¶ 16-17; ECF No. 30-1 at 17. And so, this Court lacks general personal jurisdiction over the Xylem Defendants. *See Carefirst of Md., Inc.*, *Inc*., 334 F.3d at 396.

The complaint and the undisputed facts of this case also make clear that the Court may not exercise specific personal jurisdiction over the Xylem Defendants. Section 6-103(b) of the Maryland long-arm statute confers jurisdiction over an out-of-state defendant when his agent "[c]auses tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any persistent course of conduct in the

State or derives substantial revenue from . . . services . . . in the state." Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(4). Courts have also applied the conspiracy theory of personal jurisdiction to the application of the Maryland long-arm statute, thereby permitting the Court "to exercise personal jurisdiction over a nonresident defendant without sufficient contacts with the forum if the nonresident defendant was part of a conspiracy that committed jurisdictionally sufficient acts within the forum." *Ohio Learning Ctrs.*, 2012 WL 1416905, at *5 (citing *Mackey*, 892 A.2d at 484).

To establish specific personal jurisdiction under the conspiracy theory of personal jurisdiction, here, the complaint must allege facts that show that: (1) "two or more individuals conspire to do something," (2) "that they could reasonably expect to lead to consequences in a particular forum, if" (3) "one co-conspirator commits overt acts in furtherance of the conspiracy, and" (4) the acts if committed by a non-resident would subject the non-resident to personal jurisdiction under the long arm-state of the forum state. *Mackey*, 892 A.2d at 486 (citations omitted). But, "[i]t is an inescapable constitutional requirement that a plaintiff must first make a *prima facie* claim that a conspiracy existed before a defendant is hailed into a foreign court based on the conspiracy theory of personal jurisdiction." *Ohio Learning Ctrs.*, 2012 WL 1416905, at *5; *see also Mackey*, 892 A.2d at 486 (citation omitted). "[T]o properly assert a civil conspiracy claim, it is necessary for a plaintiff to first plead the existence of a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or means employed must result in damages to the plaintiff." *Ohio Learning Ctrs.*, 2012 WL 1416905, at *5 (citation modified). And so, conclusory allegations without supporting facts demonstrating an agreement or understanding between the two persons is insufficient to support the Court's exercise of personal jurisdiction under a conspiracy theory of personal jurisdiction. *See id*. at *6.

In this case, the complaint fails to allege facts that show that Section 6-103(b)(4) of the Maryland long-arm statute applies to the Xylem Defendants, based upon a conspiracy claim theory, for two reasons. First, a careful reading of the complaint shows that the Plaintiff fails to allege facts to show that the Xylem Defendants conspired with the Moonshot Defendants to tortiously interfere with its business interest in connection with the RFP. Notably, the complaint contains only conclusory allegations that the Xylem Defendants and the Moonshot Defendants conspired to feed false and misleading information to interfere with the RFP process. ECF No. 1

¶¶ 1 and 7-8 and 50-64 (alleging conclusory allegations against the Xylem Defendants and Moonshot Defendants of a conspiracy to mislead to exploit, and to make false statements to the benefit of the Xylem Defendants and Moonshot Defendants and to the detriment of the Plaintiffs with the goal of interfering with the RFP process). The complaint also lacks factual allegations to show what false and misleading information the Defendants allegedly provided to the P3 Authority. *See generally id*. In addition, the Court also agrees with the Xylem Defendants that the complaint fails to allege facts that show Defendant Hawkins' alleged actions to interfere with the Plaintiff's business relations were unlawful or was used to achieve an unlawful act. *See generally id*. Given this, the complaint lacks factual allegations to show that the Defendants conspired together to interfere with the Plaintiff's business relationship with the P3 Authority.

Second, the complaint fails to allege specific facts to show that one of the alleged co-conspirators committed an overt action in Maryland in furtherance of the alleged conspiracy to interfere with the Plaintiff's business relationship during RFP process. In this regard, the Plaintiff alleges in the complaint that the "Defendants began to communicate through calls, emails, and texts about potential ways to undermine the IBT Team's bid." *Id*. at ¶ 49. While the Plaintiff argues in its response in opposition to the Xylem Defendants' motion to dismiss that the Moonshot Defendants sent this communication "from their home base in Maryland," the allegations in the complaint only state that the Moonshot Defendants "began to communicate through calls, emails, and texts about potential ways to undermine the [IBT Team's] bid." ECF No. 34 at 3 and 8. And so, the allegations in the complaint, taken as true, are simply not sufficient to show that any of the Defendants undertook these actions in Maryland. ECF No. 1 at ¶ 49; *Hardwire, LLC v. Ebaugh*, No. CV JKB-20-0304, No. SAG-18-2315, 2021 WL 3809078, at *10 (D. Md. Aug. 26, 2021) (holding that the Plaintiff failed to establish conspiracy theory of personal jurisdiction because, although the Maryland-based defendants "undoubtedly engaged in a persistent course of conduct in the State," the Plaintiff failed "to allege any *specific* overt acts that the [Maryland-based defendants] [took] in furtherance of their conspiracy with [the out-of-state defendant] in Maryland"); *see also Ultimate Outdoor Movies, LLC v. FunFlicks, LLC*, 2019 WL 2233535, at *8 (D. Md. May 23, 2019) (holding allegations that Maryland-based co-conspirators committed overt acts in furtherance of conspiracy sufficient to satisfy third element of a conspiracy theory of personal jurisdiction).

18

Because the allegations in the complaint, taken as true, are not sufficient to show that the Moonshot Defendants and the Xylem Defendants conspired to interfere with the Plaintiff's business relationship with the P3 Authority in Maryland, the Court **GRANTS-in-PART** the Xylem Defendants' motion to dismiss (ECF No. 30) and **DISMISSES** the claims brought against the Xylem Defendants in this case for lack of personal jurisdiction.[5]  Fed. R. Civ. P. 12(b)(2).

### B. The Plaintiff's Claims Are Timely

Turning to the Moonshot Defendants' motion to dismiss, the Court observes as a preliminary matter that the Plaintiff's tortious interference with business relationship claims against the Moonshot Defendants are timely under Maryland law.  This Court has also held that the statute of limitations for a tortious interference with contractual relations claim accrues upon the date the contract is breached or terminated.  *See J.E. Dunn Const. Co. v. S.R.P. Dev. Ltd. P'ship*, 115 F. Supp. 3d 593, 615 (D. Md. 2015) (citing cases).  In this case, the Plaintiff commenced this civil action on November 27, 2024.  ECF No. 1.  The Plaintiff alleges in this case, and it is undisputed by the Defendants, that it was formally notified by the P3 Authority of the cancellation of the Original RFP on December 2, 2021.  ECF No. 24 at 20-22.  Given this, the Plaintiff's claims arose on December 2, 2021, and the Plaintiff must have brought its claims in this case within three years of that date–December 2, 2024.  *See J.E. Dunn Const. Co.*, 115 F. Supp. 3d at 615.  Because the Plaintiff has done so, its claims are timely.

### C. The Plaintiff Fails To State Plausible Tort Claims

While the Plaintiff's tort claims are not time-barred, the Moonshot Defendants persuasively argue that that Puerto Rico law applies to those claims and that the claims are, thus, implausible.  "For claims in tort, Maryland follows the *lex loci delicti rule*," which states that when "the events giving rise to a tort action occur in more than one State," the Court must "apply the law of the State where the injury—the last event required to constitute the tort—occurred." *Smith*, 2019 WL 5538273, at *2.  And so, generally, "[t]he place of injury is the place where the injury was suffered, not where the wrongful act took place."  *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 511 (4th Cir. 1986); *see M-Edge Accessories LLC v. Amazon.com Inc*., Case No. MJG-11-3332, 2013 WL 50251, at *3 (D. Md. Jan. 2, 2013) ("[T]he place of injury is considered to be the place where the actual damage occurs, even if the conduct resulting in the injury occurred in

---

[5] Because the Court lacks personal jurisdiction over the Xylem Defendants, the Court does not address the other issues raised in the Xylem Defendants' motion to dismiss.

another state."). Where the alleged injuries are economic, rather than personal, Maryland courts traditionally consider injuries to occur where the injured party resides. *Gorby v. Weiner*, No. CIV.A. TDC-13-3276, 2014 WL 4825962, at *4 (D. Md. Sept. 23, 2014); *Starr v. VSL Pharms., Inc.*, 509 F. Supp. 3d 417, 458 (D. Md. 2020); 21 M.L.E. Torts § 2 ("The place of injury means the place where the injury was suffered rather than the place where the wrongful act took place[.]"); *Terry v. Corp. Am. Fam. Credit Union*, 2019 WL 5065183, at *7 (D. Md. Oct. 9, 2019) ("The Court concludes that Maryland should be regarded as the place of any injury to the [plaintiffs] because this is the state in which they reside, and it is logical that they have suffered economic injury where they live, where they can be sued for debt collection, and where they might claim injury to their credit ratings."). Maryland courts have not, however, explicitly addressed "the proper application of *lex loci delicti* in cases where the wrongful conduct in one jurisdiction causes pecuniary loss or injury to the plaintiff in another jurisdiction." *Menk v. MITRE Corp.*, 713 F. Supp. 3d 113, 183 (D. Md. 2024) (citation omitted). And so, in such cases, this Court has applied the law of the jurisdiction where the alleged wrongful act occurred, rather than where the alleged loss was felt. *Cremi v. Brown*, 955 F. Supp. 499, 522 (D. Md. 1997) (applying Texas law to the plaintiffs' claims common law claims of breach of fiduciary duty, negligence, negligent misrepresentation, and fraud, because Texas was where the alleged misrepresentations and omission by the defendants occurred, rather than applying the law where the plaintiff's resided—Mexico); *Menk*, 713 F. Supp. 3d at 183 ("Guided by *Cremi*, the court finds that the place of wrong is where the alleged wrongful discharge took place, which is Virginia" rather than in Maryland, the Plaintiffs' home states where the alleged injuries/harms occurred.); *Carroll v. Walden Univ., LLC*, 650 F. Supp. 3d 342, 368 (D. Md. 2022) ("Based on guidance from *Cremi*, and the allegations in the complaint, the court finds that in this case where the alleged wrongful conduct occurred in a different jurisdiction than where the loss was felt, the place of the injury is where the wrong occurred (Minnesota) not where the loss was felt (North Carolina, Louisiana, and Virginia).").

Applying the above standards to the facts of this case, the Court is satisfied that the appropriate choice of law for this tort dispute is the law of Puerto Rico. The factual allegations in the complaint make clear that the alleged tortious conduct occurred in Puerto Rico. Notably, the factual allegations in the complaint show that the Project involved replacing water meters in Puerto Rico, the RFQ was issued in Puerto Rico, by the Puerto Rican Government, and the

contract to be awarded under the RFP was to be construed under the laws of Puerto Rico.[6]  ECF No. 37 at 5; ECF No. 39-2 at 35.  Given these undisputed facts, this case is distinguishable from other cases where the Court has held that the plaintiff suffers economic injury in the place where they reside, because the factual allegations in the complaint show that any injury to the Plaintiff resulting from the alleged actions of the Defendants occurred in Puerto Rico, where the Plaintiff sought to work on the Project.  *Cremi*, 955 F. Supp. at 522 (applying Texas law to the plaintiffs' claims common law claims because Texas was where the alleged misrepresentations and omission by the defendants occurred).  And so, Court will apply the law of Puerto Rico in this case.

The complaint also makes clear that the Plaintiff's tort claims must fail when the law of Puerto Rico is applied to those claims.  To state a claim for tortious interference with a business relationship under Puerto Rico Law, the complaint must allege facts that show: (1) the existence of a contract with which a third party interferes; (2) that there is fault; (3) that the third party caused damage to the Plaintiff; and (4) that the damage is a consequence of the third party's culpable conduct, that is, that the causal link must be between the act of the third party and its effect on the injured party.  *Gen. Off. Prods. v. A.M. Capen's Sons*, 115 D.P.R. 553, 558 (1984).  Puerto Rican courts have held that "[r]egarding the first element, we have stated that if what is

---

[6] The Plaintiff also argues without persuasion that that the Court should apply Florida law in this case.  While it is undisputed that the Plaintiff's assignor, IBT, resides in Florida, the Plaintiff points to no case law to support its view that the Court should apply the law of the forum where the assignor of the injured party resides in a tort case.  *See generally* ECF No. 34.  More importantly, even if Florida law applies, the Plaintiff's tort claims remain problematic.  To state a claim for tortious interference with a business relationship under Florida law, the complaint must allege facts that show: "(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the interference." *Treco Int'l S.A. v. Kromka*, 706 F. Supp. 2d 1283, 1289 (S.D. Fla. 2010) (citation omitted).  But the complaint fails to allege any facts to show the existence of a business relationship under which the Plaintiff had any legal rights.  It is undisputed that the Plaintiff submitted a bid on a potential contract with the P3 Authority and it was not awarded a contract.  The RFQ also provides that the Puerto Rican authorities were not liable "for the costs and expenses incurred by any Proponent or Contractor in responding to this RFQ and subsequent RFP, responses to clarification requests and re-submittals, interviews (if applicable), and subsequent negotiations" and that  "[e]ach Proponent that participates in the procurement process outlined in this document shall prepare the required materials and submittals at its own expense and with the express understanding that no claim whatsoever for reimbursement from the PPP Committee, the PPP Authority or PRASA for the costs and expenses associated with the process can be made."  ECF No. 39-2 at J.R. 23.

affected is an expectation or a beneficial economic relationship, without a contract, an action for damages due to culpable interference is not admissible." *Batista Valentin v. Batista Valentin*, 2025 TSPR 93 (P.R. Oct. 1, 2025) (citing *Gen. Office Prods.*, 115 D.P.R. at 559).

In this case, the complaint makes clear that the Plaintiff's tort claims are not plausible, because it had no contract with the P3 Authority in connection with the Project. In this regard, it is undisputed that the Plaintiff did not have a contractual relationship with the P3 Authority and/or PRASA at the time of the cancellation of the Original RFP. *See* ECF No. 1 at ¶ 45 (the Plaintiff was named as the "Preferred Proponent"); ECF No. 1 at ¶ 69 ("After IBT and Miya were named as Preferred Proponent in August 2019, the next step was to negotiate a P3 Agreement with the P3 Authority."). Rather, the factual allegations in the complaint show that the P3 Authority notified the IBT Team that it had been selected as the "Preferred Proponent" for the metering project on August 12, 2019, and that the IBT Team continued to work toward advancing the metering project from August 12, 2019, until December 2021. ECF No. 1 at ¶ 46. The complaint also makes clear that the P3 Authority notified the IBT Team *via* letter that it was cancelling the Original RFP on December 2, 2021. *Id*. at ¶ 76. And so, there is no dispute that the Plaintiff did not execute a contract with the P3Authority and PRASA for the Project. *See id*. at ¶¶ 45 and 69**.**

The absence of a contractual relationship with either the P3Authority and/or PRASA is fatal to the Plaintiff's tort claims under the law of Puerto Rico. *Gen. Office Prods.,* 115 D.P.R. at 558. Because the Plaintiff fails to state a plausible claim for tortious interference with business relationship under Puerto Rican law, it similarly fails to state plausible claims for aiding and abetting tortious interference with business relationship and conspiracy to interfere with a business relationship against the Moonshot Defendants. *Futura Dev. of P.R., Inc. v. Estado Libre Asociado de P.R.*, 276 F. Supp. 2d 228, 242 (D.P.R. 2003) ("[T]he existence of a contract is an indispensable requirement in tortious interference actions."). And so, the Court must **DISMISS** these claims. Fed. R. Civ. P. 12(b)(6).

### D. The Court Grants The Moonshot Defendants' Motion To Seal

As a final matter, the Court will grant the Moonshot Defendants' motion to seal Exhibits 1, 4 and 7 to the Joint Record in this case, because these documents contain confidential information that is subject a Protective Order in a prior litigation. ECF No. 43 at ¶ 2. No objection to this motion has been filed. A careful review of the subject exhibits also shows that

these documents contain confidential business information about the business dealings between the Moonshot Defendants and Xylem Defendants.  ECF No. 43 at ¶¶ 6-8.  And so, the Court **GRANTS** Defendant Moonshots' motion to seal (ECF No. 43).

## V.    CONCLUSION

For the foregoing reasons, the Court:

(1) **GRANTS-in-PART** the Moonshot Defendants' motion to dismiss (ECF No. 30);

(2) **GRANTS-in-PART** the Xylem Defendants' motion to dismiss (ECF No. 31);

(3) **GRANTS** the Defendant Moonshots' motion to seal (ECF No. 43); and

(4) **DISMISSES** the complaint.

A separate Order shall issue.

**IT IS SO ORDERED.**

s/ Lydia Kay Griggsby
LYDIA KAY GRIGGSBY
United States District Judge